## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Kevin D. Petrulak, being duly sworn, depose and state the following:

### I. INTRODUCTION

1.  I am a Special Agent of the Internal Revenue Service, Criminal Investigation (IRS-CI), in Pittsburgh, Pennsylvania and have been employed in this capacity since January 2002. In my capacity as a Special Agent, I have participated in criminal investigations involving violations of federal criminal tax, money laundering, currency structuring, wire fraud, conspiracy against the United States, narcotics, immigration fraud, child exploitation, and food stamp fraud. During these investigations, I have assessed the criminal prosecution potential of a range of individuals and businesses based upon varying degrees of information. Through the application of a variety of investigative techniques, I determine if there is sufficient evidence to warrant a prosecution recommendation.

2.  This affidavit is submitted in support of a criminal complaint charging that from in or around July 2013 through at least May of 2017, within the Western District of Pennsylvania and elsewhere, Holly M. PARRISH did violate Title 18, United States Code, Section 1956(h). Specifically, as set forth below, PARRISH did knowingly and intentionally conspire with other persons to conduct financial transactions with property representing the proceeds of unlawful drug trafficking (Title 21, United States Code, Sections 841(a)(1) and 846), knowing that the transactions were designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, and the control of these proceeds, in violation of Title 18, United States Code, Section 1956(a)(B)(i).

3.  This affidavit is based on my personal knowledge and on information obtained from other sources, including: a) statements made or reported by various witnesses with knowledge of

1

relevant facts; b) my review of public available information relating to the defendants; and c) my review of business records, bank records and other documents and evidence obtained through Court orders, subpoenas and other sources. Because this affidavit is submitted for the limited purpose of establishing probable cause, the facts and opinions set forth herein are not the entirety of all information gathered with regard to the subjects identified herein or the investigation in general; rather, these facts are only meant to provide a summary of information sufficient for the purpose of the affidavit as set forth herein.

## II. INVESTIGATION BACKGROUND INFORMATION

4.  In August of 2015, members of the Pittsburgh District Office of the Drug Enforcement Administration (DEA) began investigating Darryl Arnold, aka "Boulders," and his Drug Trafficking Organization (DTO) due to the huge increase in opiate overdoses that began at that time. In April 2016, IRS-CI joined with DEA in the investigation of the Arnold DTO. The investigation revealed that subsequent to his 2013 release to a halfway house (after serving time in federal prison for cocaine trafficking), Arnold entered into a conspiracy with other individuals to distribute controlled substances. More specifically, investigators learned that Arnold's actions included the trafficking of heroin and fentanyl-laced heroin in the Western District of Pennsylvania, including the Mon Valley area, and that the drugs were obtained from out-of-state sources of supply in New Jersey. Arnold's drug trafficking organization was large enough to generate millions of dollars in drug proceeds. The information contained within this paragraph was obtained by investigators from many sources, including from multiple cooperators involved in the DTO.

5.  One such cooperator revealed that Darryl Arnold began utilizing his New Jersey based heroin source of supply, Marvin Anthony, in approximately 2014. This cooperator indicated

that when Arnold began purchasing heroin from Anthony, he was purchasing 200 to 300 "glassine brick" quantities at a time. The cooperator knows this information from being personally present at the time of the transaction(s), or from learning of them directly from Arnold. Like many of the cooperators in drug cases, this cooperator has a significant criminal history; including arrests for drugs, and is cooperating in the hope of lowering his/her sentence. In drug parlance, a glassine brick is street slang for a package containing 5 "bundles" of heroin and/or fentanyl. In turn, a bundle contains 10 individual dosage units called "stamp bags". Thus, 200 bricks would include approximately 10,000 individual dosage units of opiates such as heroin and/or fentanyl. Although prices vary widely based on a number of factors, a single stamp bag is commonly sold in Western Pennsylvania for approximately $10, making 200 bricks worth $100,000 on the street.

6. The cooperator stated that although they varied over time, the amounts purchased by Arnold from Anthony included transactions of up to 1,000 to 2,000 bricks of opiates at a time, with purchases occurring approximately once or twice a month. A 2,000 brick transaction would involve 100,000 dosage units valued at approximately $1,000,000 on the street. Once the heroin and/or fentanyl was delivered to the Monessen, Pa area by Anthony or one of his couriers, Arnold would distribute it to members of his organization for street level distribution.

7. One example of law enforcement's corroboration of this information occurred in 2018 when the DEA watched as Arnold was provided with hundreds of bricks of heroin by Anthony. The drugs were later seized by law enforcement and tested at the DEA lab, revealing that they contained heroin.

8. Arnold and Anthony are both currently in federal custody.

9. The investigation also revealed that the primary purpose of the money laundering conspiracy was for Arnold and his paramour Holly PARRISH to conduct cash transactions with

3

the proceeds of the Arnold DTO in a manner that was intended to disguise the true nature, source, ownership, and control of the proceeds. In doing so, Arnold and PARRISH aimed to enrich themselves and provide a lifestyle that would have otherwise been far beyond their means. The records received during the investigation determined that Arnold and PARRISH accomplished their money laundering objectives by using the cash proceeds of the Arnold DTO in conducting transactions which included: deposits into bank accounts that they controlled; credit card payments; and the purchase of money orders.

### III. PROBABLE CAUSE

10.  Records show that Arnold and PARRISH have held individually and/or joint signatory authority over the following fifteen (15) bank and credit card accounts with five (5) different institutions: PNC Bank; Valley 1st Community Federal Credit Union; Tri Boro Federal Credit Union; Barclays Bank; and JP Morgan Chase Bank:

| SUMMARY OF ANALYZED Arnold AND PARRISH BANK ACCOUNTS | | | | | |
|---|---|---|---|---|---|
| **Acct Type** | **Institution** | **Account Name** | **Acct No** | **Date Opened** | **Dates Analyzed** |
| Bank Acct | PNC Bank | Holly Parrish | Acct ending in 3317 | 04/17/2012 | 01/01/13 – 03/17/17 |
| Bank Acct | PNC Bank | Holly Parrish | Acct ending in 0636 | 08/23/2012 | 01/01/13 – 03/17/17 |
| Bank Acct | PNC Bank | Darryl Arnold | Acct ending in 1097 | 02/18/2015 | 02/18/15 – 03/17/17 |
| Bank Acct | PNC Bank | Darryl Arnold | Acct ending in 1118 | 02/18/2015 | 02/18/15 – 03/17/17 |
| Bank Acct | PNC Bank | Darryl Arnold | Acct ending in 1126 | 02/18/2015 | 02/18/15 – 03/17/17 |
| Bank Acct | PNC Bank | Darryl Arnold & Holly Parrish | Acct ending in 8224 | 10/25/2016 | 10/25/16 – 03/17/17 |
| Bank Acct | PNC Bank | Darryl Arnold & Holly Parrish | Acct ending in 8232 | 10/25/2016 | 10/25/16 – 03/17/17 |
| Bank Acct | PNC Bank | Darryl Arnold & Holly Parrish | Acct ending in 8259 | 10/25/2016 | 10/25/16 – 03/17/17 |

4

| | | | | | |
|---|---|---|---|---|---|
| Bank Acct | Valley 1st Federal Credit Union | Darryl Arnold | Acct ending in 3430 | 06/03/2014 | 06/03/14 – 10/31/16 |
| Bank Acct | Valley 1st Federal Credit Union | Arnold's Sales & Rentals, LLC | Acct ending in 6640 | 09/05/2015 | 09/05/15 – 10/31/16 |
| Bank Acct | Tri Boro Federal Credit Union | Holly Parrish | Acct ending in 3227 | 06/02/2015 | 06/02/15 – 11/30/16 |
| Credit Card | PNC Bank | Holly Parrish | Acct ending in 1833 | 10/15/2015 | 10/15/15 – 12/31/16 |
| Credit Card | PNC Bank | Holly Parrish | Acct ending in 7200 | 12/19/2016 | 12/19/16 – 06/30/17 |
| Credit Card | JP Morgan Chase | Holly Parrish | Acct ending in 6550 | 03/10/2014 | 03/01/14 – 07/31/17 |
| Credit Card | Barclays Bank | Holly Parrish | Acct ending in 0157 | 06/22/2014 | 06/01/14 – 06/30/17 |

11. As shown in the table below, the analyses of the deposits into the above identified bank accounts revealed that, from January 2013 through March 2017, Arnold and PARRISH combined together to deposit $517,560.11 into the accounts. Of those deposits, the analyses further showed that at least $313,672.72 were currency (cash) deposits.

| DEPOSIT SUMMARY FOR KNOWN Arnold & PARRISH BANK ACCOUNTS | | | | | |
|---|---|---|---|---|---|
| Year | Currency Deposits | Check/Direct Deposits | Transfers/ Redeposits | Unidentified Deposits | Total Deposits |
| 2013 | $9,160.00 | $21,093.07 | $4,605.30 | $3,110.00 | $37,968.37 |
| 2014 | $19,766.00 | $23,675.49 | $4,442.09 | $1,495.00 | $49,378.58 |
| 2015 | $120,543.00 | $20,656.83 | $11,566.25 | $8,832.64 | $161,598.72 |
| 2016 | $137,193.72 | $27,812.96 | $24,644.15 | $24,746.58 | $214,397.41 |
| 2017 | $27,010.00 | $13,680.24 | $12,426.79 | $1,100.00 | $54,217.03 |
| TOTAL | $313,672.72 | $106,918.59 | $57,684.58 | $39,284.22 | $517,560.11 |

12. In addition to the cash deposits, the analyses of the above credit card accounts in PARRISH's name revealed that she made at least $9,672.50 in cash payments to the accounts,

5

bringing Arnold and PARRISH's direct use of cash through the above accounts to at least $323,345.22. Of this amount, $196,813.22 was transacted through accounts that PARRISH had sole signature authority over.

13. In addition to Arnold and PARRISH's direct use of cash in conducting banking deposits and credit card payments, the analyses of PARRISH's credit card accounts revealed that PARRISH indirectly utilized cash to make additional payments on the accounts through the purchase of money orders. It was determined that, from June 2014 through July 2017, PARRISH purchased at least $13,600 in money orders to pay on her accounts. These money order payments bring the total amount of cash transacted through accounts where PARRISH held sole signature authority to at least $210,413.22.

14. The investigation determined that neither Arnold nor PARRISH had sufficient legitimate cash sources to support the cash and money orders that they transacted through their accounts. It should be noted that Arnold was in prison serving a sentence for federal cocaine trafficking until on or around July 16, 2013 when he was released to a "Renewal Center".

15. According to his federal tax filings, from 2013 through the end of 2016, Arnold earned relatively small amounts of income working at a construction company, Canfield Development, and a restaurant, Ohio Valley Bistro, neither of which would be a significant source of cash. A summary of the income information contained on the U.S. Individual Income Tax Returns (Forms 1040 and/or 1040A) filed for Arnold for the 2013 through 2016 tax years is as follows:

| REPORTED INCOME FOR DARRYL ARNOLD: 2013 - 2016 | | | | | |
|---|---|---|---|---|---|
| Description | 2013 | 2014 | 2015 | 2016 | Total |
| Wages | No Return Filed | $7,158.00 | No Return Filed | $2,075.00 | $9,233.00 |
| Partnership Income (Arnold Sales & Rentals) | $0.00 | $0.00 | $0.00 | $8,628.00 | $8,628.00 |
| **Total Income** | **$0.00** | **$7,158.00** | **$0.00** | **$10,703.00** | **$17,861.00** |

16. A further review of the tax return that Arnold filed for the 2014 tax year shows that he reported his current occupation as "dishwasher" for the year and that he received the $7,158 in W-2 wages from a company called "Ohio Valley Bistros, Inc".

17. A further review of the tax return that Arnold filed for the 2016 tax year shows that he reported his current occupation as "Self-Employed" and that he received the $2,075 in W-2 wages from a company called "Canfield Development". In addition, Arnold reported partnership income from his real estate rental business (Arnold Sales & Rentals) of $8,628 for the year.

18. A summary of the income information contained on the U.S. Individual Income Tax Returns (Forms 1040 and/or 1040A) filed for PARRISH for the 2013 through 2016 tax years is as follows:

| REPORTED INCOME FOR HOLLY PARRISH: 2013 – 2016 | | | | | |
|---|---|---|---|---|---|
| Description | 2013 | 2014 | 2015 | 2016 | Total |
| Wages | $24,377.00 | $21,461.00 | $10,157.00 | $16,093.00 | $72,088.00 |
| **Total Income** | **$24,377.00** | **$21,461.00** | **$10,157.00** | **$16,093.00** | **$72,088.00** |

19. A further review of the tax return that PARRISH filed for the 2013 tax year shows that she reported her current occupation as "Resident Program Worker" and that she received $21,633 and $2,742 in W-2 wages from "Div Hum Serv Inc" and "United Parcel Service", respectively.

20.     A further review of the tax return that PARRISH filed for the 2014 tax year shows that she reported her current occupation as "Resident Program Worker" and that she received $7,305 and $14,154 in W-2 wages from "Div Hum Serv Inc" and "Mon Valley Cares", respectively.

21.     A further review of the tax return that PARRISH filed for the 2015 tax year shows that she reported her current occupation as "Resident Program Worker" and that she received $5,969 and $4,187 in W-2 wages from "Div Hum Serv Inc" and "PNC Bank", respectively.

22.     A further review of the tax return that PARRISH filed for the 2016 tax year shows that she reported her current occupation as "Teller" and that she received $16,092 in W-2 wages from "PNC Bank".

23.     A summary of the total income reported by both Arnold and PARRISH for the 2013 through 2016 tax years is as follows:

| SUMMARY OF INCOME REPORTED BY ARNOLD AND PARRISH | | | | | |
|---|---|---|---|---|---|
| Description | 2013 | 2014 | 2015 | 2016 | Total |
| Total Income Reported by PARRISH | $24,377 | $21,461 | $10,157 | $16,093 | $72,088 |
| Total Income Reported by Arnold | $0.00 | $7,158 | $0.00 | $10,703 | $17,861 |
| TOTALS | $24,377 | $28,619 | $10,157 | $26,796 | $89,949 |

24.     On November 13, 2017, PARRISH told investigators during an interview that she knew some of the cash that she and Arnold transacted to have come from three sources: cash that Arnold held prior to reporting to prison for his previous conviction, cash earned from Arnold's rental properties, and cash that she and Arnold withdrew from their bank accounts.

25.     It should be noted that if some of the earlier cash deposits made by PARRISH were

in fact made with cash that Arnold earned through his cocaine enterprise prior to reporting to prison, that cash would also constitute the proceeds of an SUA (cocaine trafficking) and the laundering of those proceeds should not be treated any differently than the laundering of subsequent proceeds that were earned through heroin trafficking.

26. Relative to the possibility that some of the cash transacted by Arnold and PARRISH could have come from rental receipts, the investigation determined that, from June 18, 2014 through February 22, 2017, Arnold did purchase eleven (11) properties in the Monessen, Pennsylvania area. However, the analysis of public real estate records for these purchases shows that Arnold only paid approximately $34,721.69 for all eleven (11) properties combined with only 2 of the properties being purchased prior to April 2015. The fact that these properties were very low-dollar valued properties at the time of their purchase (with the most expense costing approximately $7,500), the rental earning potential for these properties (assuming that they were being rented and the renters paid in cash) would not be commensurate with Arnold and PARRISH's cash activities. In addition, Arnold and PARRISH had already begun to conduct large transactions prior to the spring of 2015 when Arnold began purchasing these properties in earnest. It should be noted that the analysis of debits from the bank accounts for Arnold, PARRISH, and Arnold Sales & Rentals, LLC did not reveal any withdrawals from the accounts that would indicate that the accounts were utilized to purchase the properties, indicating that another source of funds, or cash, was used to make the purchases. The significance of this fact is notable in that these real estate purchases represent approximately $34,721.69 in additional funds available to Arnold and PARRISH during the 2013 through 2016 time period that did not flow through their bank accounts.

27. A summary of the income information contained on the U.S. Return of Partnership Income (Form 1065) and Rental Real Estate Income and Expenses of a Partnership or an S Corp

9

(Form 8825) filed for Arnold's Sales and Rentals, LLC for the 2013 through 2016 tax years is as follows:

| REPORTED GROSS INCOME FOR ARNOLD'S SALES AND RENTALS: 2013 – 2016 | | | | | |
|---|---|---|---|---|---|
| Description | 2013 | 2014 | 2015 | 2016 | Total |
| Gross Sales per Form 1065 | No Return Filed | No Return Filed | No Return Filed | $6,539.00 | $6,539.00 |
| Gross Rents per Form 8825 | No Return Filed | No Return Filed | No Return Filed | $34,733.00 | $34,733.00 |
| Total Gross Income | $0.00 | $0.00 | $0.00 | $41,272.00 | $41,272.00 |

28. A review of Form 1065 filed for Arnold's Sales and Rentals for the 2016 tax year revealed that Arnold and PARRISH are both shown to be partners in the business.

29. The analysis of the credits to the Arnold Sales & Rentals partnership bank account revealed that checks from Westmoreland HAP, a program involved in providing housing assistance, accounted for at least $2,883 of the deposits into the account. Consequently, based on the reported Gross Sales and Gross Rents for the partnership, it would only have been possible for Arnold and PARRISH to have received <u>at most</u> $38,389 in cash receipts ($41,272-$2,883).

30. Relative to PARRISH's assertion that some of the cash that they transacted could have come from cash withdrawals from their banking accounts, the analyses of the debits from all known financial accounts in Arnold and PARRISH's names only identified $17,657.41 in cash withdrawals and $17,916.99 in unidentified withdrawals [1] that were made from the accounts through the analyzed time periods. It should be noted that even under the unlikely assumption that all of the $35,574.40 in cash and unidentified withdrawals noted above were in fact cash withdrawals that were later deposited into Arnold and PARRISH's accounts, it would not explain

---

[1] Unidentified withdrawals are withdrawals that were unable to be identified through the records provided by the financial institutions.

the totality of the their cash activities.

31. In addition to being unable to support their cash activities through legitimate sources, the investigation also determined that Arnold and PARRISH structured their cash deposit and payment activities in such a manner that was intended to conceal the true source, nature, and ownership of the proceeds. For instance, the cash deposited into the Arnold and PARRISH bank accounts consisted of four hundred ninety-four (494) separate cash deposits, the majority of which appear to have been made through the use of ATM machines instead of in-person deposits at the branch.

32. By year, Arnold and PARRISH made twenty-four (24) cash deposits in 2013; sixty-six (66) cash deposits in 2014; one hundred ninety-five (195) cash deposits in 2015; one hundred seventy-one (171) cash deposits in 2016, and thirty-eight (38) cash deposits from January 01, 2017 thru March 15, 2017. An analysis of the cash deposits as they relate to Arnold's release from prison and the renewal center is as follows:

    a. 02-22-2013 thru 07-16-2013: Sixteen (16) Cash Deposits – Totaling $7,177.00 (Prior to Arnold's release) [2]

    b. 07-17-2013 thru 10-10-2014: Thirty six (36) Cash Deposits – Totaling $8,072.00 (Arnold at Renewal Center) [3]

    c. 10-11-2014 thru 10-26-2016: Four hundred forty-two (442) Cash Deposits – Totaling $298,423.72 (After Arnold's release from the Renewal Center)

33. As shown above, Arnold and PARRISH's cash deposit activity increased greatly after Arnold's release from prison and the Renewal Center, as they only combined to make fifty-

---

[2] As discussed throughout this affidavit, PARRISH stated to investigators that some of the cash that she transacted was cash that Arnold held prior to reporting to prison, which would in essence make those SUA proceeds from Arnold's prior cocaine DTO.

[3] It should be noted that according to the Probation Office, Arnold would have been permitted the necessary freedom to conduct some banking business while at the Renewal Center, including establishing bank accounts in his name and making deposits.

two (52) deposits totaling $15,249.00 over the approximate twenty (20) month time period prior to and following his release from prison and the Renewal Center (February 2013 through October 2014), but conducted four hundred forty-two (442) cash deposits totaling $298,423.472 during the next twenty-nine (29) months (October 2014 through March 2017) after he was released on supervision. It should be noted that making four hundred forty-two (442) cash deposits over twenty-nine (29) months is an average of one deposit every two days (30.42 average days per month times twenty-nine (29) months divided by four hundred forty-two (442) deposits equals 1.995). In addition, the analysis of PARRISH's Barclays Bank credit card account revealed that a cash advance of $100 was charged to the account on or around August 18, 2014, or approximately one to two months prior to Arnold's full release from the Renewal Center. It should be noted that individuals with access to large amounts of cash typically would not engage in such a transaction due to the high fees and interest associated with them, thus further demonstrating that PARRISH did not have access to large amounts of cash prior to Arnold's full release from the Renewal Center.

34. PARRISH's knowledge about structuring rules, regulations, and reporting requirements relative to cash transactions can be demonstrated through her employment as a PNC Bank teller in 2016 and 2017. A PNC Bank representative told investigators that, as a PNC Bank employee, PARRISH would have been knowledgeable about structuring rules, regulations, and reporting requirements relative to cash transactions behind conducting at a financial institution, such as PNC Bank. This would apparently include knowledge that PNC Bank hired an outside service to empty and maintain their ATM machines, making it much less likely that PNC would uncover suspicious transactions made through an ATM than at a teller inside the bank. The representative further advised that red flags would have been raised if branch personnel would have been aware of the cash activities discussed within this complaint during PARRISH's

employment there. The investigation obtained photographs of PARRISH and Arnold conducting cash deposit transactions at PNC Bank ATMs. In one of these photos, PARRISH appears to be wearing her PNC Bank employee badge at the time of the deposit. As such, it appears that PARRISH would walk out of the bank where she worked to deposit money into the ATM, before walking back into the bank to work. PARRISH acknowledged during her interview with investigators that the photo depicts her making a cash deposit at the ATM outside of her own PNC branch on a lunch break. PARRISH claimed that she utilized ATMs to make deposits because it is "easier".

35. As but one example of an instance when records reveal that Arnold and PARRISH's cash structuring activity exceeded $10,000 in a relatively short period of time is as follows:

| EXAMPLE OF ARNOLD AND PARRISH STRUCTURING ACTIVITY ||||| 
|---|---|---|---|---|
| Date | Acct Info | Description | Trans Amt | Analysis Notes |
| 04/05/2016 | PARRISH PNC #3317 | Cash Deposit | $2,000.00 | Noble Manor Branch / 14:50 |
| 04/08/2016 | PARRISH PNC #3317 | Cash Deposit | $1,000.00 | ATM Deposit 1 Foster Ave Pittsburgh PA |
| 04/08/2016 | PARRISH PNC #3317 | Cash Deposit | $560.00 | ATM Deposit 1 Foster Ave Pittsburgh PA |
| 04/11/2016 | Arnold PNC #1097 | Cash Deposit | $250.00 | ATM Deposit 1736 Carson Str Pittsburgh PA |
| 04/13/2016 | PARRISH PNC #3317 | Cash Deposit | $2,960.00 | ATM Deposit 1 Foster Ave Pittsburgh PA |
| 04/20/2016 | Arnold PNC #1097 | Cash Deposit | $700.00 | ATM Deposit 451 Clairton Bl Pittsburgh PA |
| 04/20/2016 | Arnold's Sales & Rentals LLC Valley 1st #6640 | Cash Deposit | $6,560.00 | |
| 04/21/2016 | Arnold PNC #1097 | Cash Deposit | $700.00 | ATM Deposit 451 Clairton Bl Pittsburgh PA |
| | TOTAL | | $14,730.00 | |

36. In addition to structuring their cash deposits, PARRISH's credit card accounts revealed that she structured the purchase of the money orders used to make the payments on the accounts. In one instance, PARRISH purchased thirteen (13) money orders totaling $7,700 to cover charges made on her JP Morgan Chase account #7588. Of those thirteen (13) money orders, seven (7) were determined to have been purchased on the same day at three (3) different locations. The $7,700 in charges made on the account prior to the posting of these money order payments included charges made with United Airlines on February 02, 2017 for three (3) flights to Fort Lauderdale, FL totaling $1,705.20 and with Fontainebleau Resort in Miami, FL on February 13 and 14, 2017 for $4,823.66. A summary of the March 2017 money order payments made to the PARRISH JP Morgan Chase account #7588 is as follows:

| SCHEDULE OF MONEY ORDER PAYMENTS TO JP MORGAN ACCT #7588 – MARCH 2017 | | | | | |
|---|---|---|---|---|---|
| M.O. Date | M.O. # | Purchaser | M.O. Memo | Purchase Location Info | Amount |
| 02/03/2017 | 24383926034 | Holly PARRISH | Acct # ending in 7588 | USPS MO - 15205 | $500.00 |
| 02/03/2017 | 24383926023 | Holly PARRISH | Acct # ending in 7588 | USPS MO - 15205 | $1,000.00 |
| 02/22/2017 | 24383927013 | Holly PARRISH | Acct # ending in 7588 | USPS MO - 15205 | $1,000.00 |
| 02/22/2017 | 24383927024 | Holly PARRISH | Acct # ending in 7588 | USPS MO - 15205 | $500.00 |
| 02/22/2017 | 24383927002 | Holly PARRISH | Acct # ending in 7588 | USPS MO - 15205 | $1,000.00 |
| 02/22/2017 | 17-556900521 | Holly PARRISH | Acct # ending in 7588 | WU MO - Purchased at Giant Eagle | $500.00 |
| 02/22/2017 | 17-556900522 | Holly PARRISH | Acct # ending in 7588 | WU MO - Purchased at Giant Eagle | $500.00 |
| 02/22/2017 | 47-033951179 | Holly PARRISH | Acct # ending in 7588 | WU MO - Purchased at | $500.00 |

|  |  |  |  | Rite Aid |  |
| --- | --- | --- | --- | --- | --- |
| 02/22/2017 | 47-033951178 | Holly PARRISH | Acct # ending in 7588 | WU MO - Purchased at Rite Aid | $500.00 |
| 02/26/2017 | 17-541219729 | Holly PARRISH | Acct # ending in 7588 | WU MO | $200.00 |
| 02/26/2017 | 17-541219728 | Holly PARRISH | Acct # ending in 7588 | WU MO | $500.00 |
| UNK | 47-034822500 | Holly PARRISH | Acct # ending in 7588 | WU MO - Purchased at Rite Aid | $500.00 |
| UNK | 47-034822498 | Holly PARRISH | Acct # ending in 7588 | WU MO - Purchased at Rite Aid | $500.00 |
| **TOTAL** |  |  |  |  | **$7,700.00** |

37. A review of records from United Airlines shows that the above referenced charges with the airline were used to fund the purchase of airfare for three (3) individuals from New Jersey, including Marvin Anthony, who, as discussed previously, is a known source of heroin for the Arnold DTO.

38. When questioned as to why she would purchase a $6,500 trip for these individuals, PARRISH initially told investigators that she didn't pay for the trip because "they gave her the money". PARRISH clarified her statement to say that these individuals did not give her the money themselves, but Arnold gave her the money and said it was from them. PARRISH advised that she only knows one of the individuals, but she does not know him by name. PARRISH stated that Arnold told her that he knows this individual from when he was in prison. PARRISH met this individual once at a wedding. PARRISH stated that she does not believe that anyone else went on this trip with these other individuals.

39. When questioned as to why she structured her cash transactions, PARRISH stated that she only structured one transaction. PARRISH explained that she structured the money orders payable to JP Morgan Chase that were used to pay for the trip for Arnold's New Jersey friend.

15

PARRISH stated further that she structured the purchase of those money orders the way she did because she did not know those individuals. In essence, PARRISH confessed to money laundering in that she wanted to hide the transaction from the government in case the individuals on the trip were involved in criminal activity.

40. Both Arnold and PARRISH utilized the laundered proceeds of the Arnold DTO to enrich themselves and provide a lifestyle that would have otherwise been far beyond their means. For example, the debit analyses of the Arnold and PARRISH bank and credit card accounts that were used to transact the proceeds of the Arnold DTO revealed the following types of debits were made from the accounts:

    a. Shoe Retailers (such as Finish Line & Foot Locker): $11,639.66
    b. Gucci Retailers: $5,734.60
    c. Home Improvement Retailers (such as Home Depot & Lowes): $14,374
    d. Airline Companies (such as American Airlines & Delta): $14,212.32
    e. Rental Car Companies (such as Enterprise & Avis): $18,971.28
    f. Amazon: $12,682.67
    g. Hotel Companies: [4] 18,121.14
    **TOTAL: $95,735.67**

41. As shown above, the amounts of these expenditures <u>alone</u> are greater than the entire reported income for Arnold and PARRISH combined. Overall, the investigation revealed that Arnold and PARRISH spent many times more than their reported income.

## CONCLUSION

42. Based on the above described facts, I submit that there is probable cause to believe that HOLLY M. PARRISH knowingly conspired with Arnold, as well as others, in violation of Title 18, United States Code, Section 1956(h). Specifically, PARRISH joined together with

---

[4] It should be noted that the Arnold and PARRISH hotel debits included hotels that provided luxury accommodations, such as The Ritz Carlton – Miami, FL; Nemacolin Woodlands, Farmington, PA; and Fontainebleau Resort, Miami, FL.

Arnold, and others, to knowingly conduct financial transactions with property representing the proceeds of narcotics trafficking, a specified unlawful activity, knowing that the transactions were designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

Kevin D. Petrulak
Special Agent, IRS-CI

Subscribed and sworn to before me
this __7th__ day of October, 2019,
at Pittsburgh, Pennsylvania.

HONORABLE MAUREEN P. KELLY
United States Magistrate Judge